## Commonwealth v. DeMarteleire

*Charles E. Donahue,* for Commonwealth.
*Michael S. Bomstein,* for defendent.

BORTNER, *J.,* January 11, 1979—On April 14,

1978, Vincent Joseph DeMarteleire received a notice of the revocation of his hunting and trapping privileges in the Commonwealth of Pennsylvania for a period beginning September 1, 1978 through August 31, 1980. This action was taken by the Pennsylvania Game Commission under authority of the Act of June 3, 1937 (P.L. 1225 as amended), known as the "Game Law." Thereafter the licensee took a timely appeal from said revocation action to the Court of Common Pleas of Bucks County. In that connection a hearing was held on June 20, 1978. The transcript of that proceeding is of record.

After consideration of the evidence adduced by the licensee and the Commonwealth of Pennsylvania we do make the following

## FINDINGS OF FACT

1. Petitioner is Vincent DeMarteleire, an individual licensed to hunt and trap in Pennsylvania.

2. On November 29, 1977, petitioner was hunting deer in the vicinity of Port Allegheny, McKean County, Pa.

3. November 29, 1977, was closed season for antlerless (doe) deer in Port Allegheny, Pa. (Doe season in McKean County was December 16 and 17).

4. The Pennsylvania Game Regulations prohibit the killing of antlerless (doe) deer in closed season.

5. At 10:25 a.m. on November 29, 1977, petitioner killed a doe deer in the vicinity of Port Allegheny, Pa.

6. The said doe deer was shot by petitioner accidentally while he was firing at an antlered (buck) deer.

7. Petitioner killed the doe deer after it was im-

mobilized from the first shot (which passed through the buck) in order to put it out of its misery.

8. Petitioner soon thereafter spoke to one Robert Johnson, who advised petitioner that the accidental shooting of a doe deer in closed season should be reported to the game warden "as soon as possible."

9. The District Game Protector for Port Allegheny, McKean County, Pa. on November 29, 1977, was one James Rankin.

10. That as of 10:00 p.m. on November 29, 1977, petitioner had not notified the game protector of his killing of a doe deer on that day.

11. At approximately 10:00 p.m., November 29, 1977, James Rankin and Gary Smith, a game protector trainee, went to the farm at which petitioner was then staying and although he was not asked about a doe by the game warden or his trainee, defendant volunteered nothing to them about his having accidentally killed the doe.

12. Petitioner was thereafter advised by Gary Smith that he had violated the Pennsylvania Game Laws, in that he had not immediately reported a mistake killing of a deer to the game protector.

13. Gary Smith advised petitioner of his right to a hearing before a district magistrate, or alternatively, of his right to sign a field acknowledgment of guilt.

14. Petitioner chose to (and did in fact) sign a field acknowledgment of guilt as his chosen alternative to going before a district justice for a hearing.

15. On March 31, 1978, the Pennsylvania Game Commission revoked petitioner's hunting license and notified him of same by letter dated April 14, 1978.

16. On May 8, 1978, petitioner appealed the revocation order to this court.

## DISCUSSION

The Commonwealth's position in this case consists of four interrelated contentions. One, that the Pennsylvania Game Commission is empowered to set rules and regulations governing the seasons during which doe may or may not be killed in Pennsylvania. Two, that the killing of a doe out of season is a violation of those rules and regulations. Three, that such a violation is culpable under Pennsylvania Law, even though done accidentally.[1] Four, that an individual who acknowledges his guilt of such a violation may have his hunting license revoked by the Game Commission.

Petitioner's contention is two-fold. One, that his acknowledgment of guilt was only an acknowledgment of taking the life of the doe, not of criminal intent to do so, and therefore should not be conclusive of his guilt of the violation with which he was charged. Two, that the killing of a doe in closed season is unlawful only if done with criminal intent and that it is the Commonwealth's burden to prove same.

Based upon the testimony at trial of James Rankin (the District Game Protector) and Gary Smith (the Game Protector Trainee), we do not believe that petitioner knowingly and intelligently waived his right to deny criminal intent in his acknowledgment of guilt by way of signing a field receipt. We therefore find preliminarily, although our holding in this opinion makes the point moot, that to the extent petitioner's signing of the field receipt constituted an acknowledgment of criminal intent on his part, the field receipt is vitiated.

---

1. Except in one specific situation which reduces the penalty for the violation, which is not here applicable for reasons that will become apparent in the course of this opinion.

The Commonwealth's first contention is unassailable. The Game Commission is authorized by 34 P.S. § 1311.505 to fix seasons for the hunting and killing of any speciaes of game animal. Since there is no dispute but that a doe is a game animal,[2] the Game Commission was authorized to fix seasons for the hunting and killing of doe.

The statute makes it unlawful for any person to violate any of the rules and regulations properly adopted by the Game Commission, and specifically prohibits the "taking" of game animals at a time contrary to such rules and regulations.

One regulation which the Game Commission adopted pursuant to the authority granted by 34 P.S. § 1311.505 is set forth in 58 Pa. Code Chapter III, § 111.5, entitled "Pennsylvania Game Commission Official Seasons and Bag Limits 1977-1978." That regulation fixes the open season for antlerless deer (doe) in 1977, and limits it to December 16 and 17.[3]

When petitioner killed a doe on November 29, 1977, in McKean County, he thus killed it out of season. By doing so, he killed a game animal at a time contrary to the season fixed for doing so by the Game Commission and in apparent contravention of the Game Commission's regulations. It is that act for which petitioner was cited, and to which he acknowledged his guilt by signing a field receipt.

Petitioner contends that the Commonwealth is required to prove not only his killing of the doe in closed season, but his criminal intent in doing so. The Commonwealth argues, to the contrary, that criminal intent need not be shown, because 34 P.S.

2. See 34 P.S. § 1311.101 in this regard.

3. Except as to certain enumerated Southeastern Counties, of which McKean County was not one.

§1311.505 imposes absolute liability. Since both the Commonwealth and the petitioner concede that §305(a) of the Pennsylvania Crimes Code 18 Pa.C.P.S.A. §305(a), sets forth the criteria for deciding the issue, and we agree that it is dispositive, we turn our attention to it.

Section 305(a) provides as follows:

"The requirements of culpability prescribed by Section 301 of this title (relating to requirement of voluntary act) and Section 302 of this title (relating to general requirements of culpability) do not apply to:

(1) summary offenses, unless the requirement involved is included in the definition of the offense or the court determines that its application is consistent with effective enforcement of the law defining the offense; or

(2) offenses defined by statutes other than this title, in so far as a legislative purpose to impose absolute liability for such offenses or with respect to any material element thereof plainly appears."

The violation of 34 P.S. §1311.505 is an offense defined by a statute other than the Pennsylvania Crimes Code; to wit, it is a violation of the Pennsylvania Crimes Laws. Consequently §305(a)(2) of the Crimes Code will govern our inquiry as to whether or not 34 P.S. §1311.505 imposes absolute liability.

Section 305(a)(2) provides in substance that a legislative purpose to impose absolute liability for an offense must plainly appear in order for the culpability requirements of §302(b) an §301(a) of the Crimes Code not to apply to it. We hold that a legislative purpose to impose absolute[4] liability under 34

---

4. Except as to one qualification we discuss, supra, in our treatment of 34 P.S. §1311.710.

P.S. § 1311.505 is plainly apparent, and hence a culpability requirement is inapplicable to it.

We reach this conclusion based upon the following considerations: The legislative intent in enacting the Game Law of 1937, of which 34 P.S. § 1311.505 is a part, and our reading of § 505 in light of, and in conjunction with § 710 of that same act.

That the reading of a statute as a whole, and in its entirety, is necessary in determining its real meaning and the legislative intent in enacting it, is a fundamental canon of statutory construction. For only thereby will the court get an exact conception of the statute's aim, scope and objects: Statutory Construction Act of 1972, 1 Pa.C.S. § 1922; Keit v. Ross, 17 Pa. Commonwealth Ct. 183, 331 A. 2d 582 (1975).

We therefore begin our inquiry with an analysis of the legislature's intent in enacting the Game Law of 1937, as it is manifested in that statute.

Initially, we must ascertain the purpose and scope of the statute; to wit, what harms the act seeks to prevent, and what classes of things it seeks to protect. The Commonwealth suggests that the purpose of the Game Law of 1937 is "to control, regulate and protect the game animal population in the Commonwealth." This is entirely consistent with the statement of duties of the Game Commission set forth in 34 P.S. § 1311.210, which provides:

"It is the duty of said commission to protect, propogate, manage, and preserve the game, fur-bearing, and protected birds of the state . . ."

We glean one salient perception from the foregoing statements of purpose, ipsissimis verbis; the Game Law attempts to maintain a healthy and properly balanced game animal population within Pennsylvania, and does so by aiding the propoga-

tion of these animals. As to animals so propogated, it then attempts to "preserve and protect" them.

Of course, by permitting the hunting of those animals within prescribed limits, the statute regulates artificially what nature cannot do; to wit, it maintains an ecological balance among all the protected animals. So that, the fixing of open and closed seasons constitutes a mechanism by which the equilibrium is maintained. Hunting of the animals reduces the game population at peak times, allowing ample food and space for the remaining animals; the prohibition of same allows further propogation of each species in its turn, until the equilibrium again becomes imbalanced, at which time hunting is once again permitted.

In light of the above, we must attach some significance to the Commonwealth's argument that if this court were to require a culpability requirement for § 1311.505, it would be more difficult for the Game Commission to control the unlawful killing of game animals, since defendants could or would presumably argue that the out-of-season killings were accidental. For if the equilibrium sought to be maintained by the Game Laws were subject to the vagaries of the hunter's mental state, there could never be a state of equilibrium, and the purpose of the Game Laws would be for nought.

Petitioner offers a sound rebuttal to this argument of the Commonwealth. He argues that the state's concern about a proliferation of "accidents" in the event of a ruling in his favor should not preclude a consideration of this case, as every case, on its merits, for that is the nature of due process.

We agree with petitioner in that respect, and would be inclined to agree with him vis a vis the culpability requirement were the above to be our only consideration. However, such is not the case. To the contrary, we must consider § 1311.505 in the

context of its complement, §1311.710. And it is this consideration which fully negates the force of petitioner's logic.

Under the express provisions of the Statutory Construction Act, every law must be construed, if possible, to effectuate all of its provisions: 1 Pa.C.S. §1922; Barclay White Co. v. Unemployment Compensation Board of Review, Dept. of Labor and Industry, 356 Pa. 43, 50 A. 2d 336. cert. denied 68 S.Ct. 63, 322 U.S. 761, (1947)(stating the same principle under judicially imposed rules of construction). With that in mind, we proceed to analyze §1311.505 and 1311.710 in juxtaposition.

34 P.S. §1311.710 provides as follows:

"Each individual who may, by mistake, kill, or during the regular open hunting season by mistake attempt to kill, any wild bird or animal, contrary to the provisions of this act, or any rules and regulations of the commission, may, within twenty-four hours, pay one-forth of the penalty imposed by law for the illegal killing of any bird or animal to a legally authorized representative of the commission, if such individual, to the best of his ability, shall at once remove the entrails of any animal and deliver the carcass of any bird or animal so killed to any game protector or his residence for disposition as hereinafter provided and shall, within twenty-four hours after such killing, or attempted killing, make and deliver to such officer to whom such penalty was paid a statement in writing, under oath, explaining when and where and how such mistake was made."

"Said portion of the penalty and the sworn statement together with the officer's report, shall be forwarded to the director as quickly as possible for review. If after investigation the director is not satisfied said killing, or attempted killing, was done

by mistake, but was caused by negligence or carelessness, he shall order the defendant to be prosecuted in the regular manner, and the amount so deposited shall be applied toward the payment of the full penalty and any costs of prosecution as provided in this act. 1937, June 3, P.L. 1225, Art VII, §710; 1939, June 24, P.L. 810, §1."

Reading §710 in its entirety, this much is readily apparent. It applies only when a hunter kills (or attempts to kill) a game animal by mistake[5] in contravention of the hunting rules and regulations; and it applies only to mistake killings "not caused by negligence or carelessness."

The section thus differentiates not only mistake killings from all other killings, but non-negligent mistake killings from all other mistake killings. The parameters of the defense available under §710 are thus demonstrably quite narrow. And it is this narrowness to which we attach significance.

Reducing §710 to its skeletal parts, this much is certain. It is only applicable to mistake killings not caused by negligence or carelessness. It cannot be asserted at all unless its preliminary requirements[6] are fulfilled. And it is only a partial defense[7] to the unlawful killing of a game animal.

---

5. We here treat "accident" and "mistake" for purposes of this case as the same; that is, that the killing is not the product of negligence or carelessness, and is unintentional.

6. The violator must remove the dead animal's entrails and deliver the carcass to the game protector or his residence immediately following the killing.

The violator must, within 24 hours of the killing, make and deliver to the game protector or his residence a statement in writing, under oath, explaining how, when and where the killing occurred.

7. It is not a total defense, but may reduce the applicable penalty; i.e., 1/4 of the penalty otherwise imposed, plus no suspension or revocation or suspension of hunting privileges.

With that in mind, we again turn our focus to §505. In so doing, we cannot but conclude that the narrowness of §710, and the rigidity with which it applies, indicate a plain intention on the part of the legislature to impose absolute liability under §505.

Had the legislature not so intended, the narrowness of §710 would be inexplicable.[8] Moreover, were we to find that a legislative intent to impose absolute liability did not appear under §505, the purpose of §710 would be obviated. For why would anyone plead "mistake" under §710, and meet all of its requirements for a reduced penalty, when that person could claim mistake, at an appellate hearing months later, without complying with any of the conditions of §710, and not be subject to any penalty.

It is the duty of this court to harmonize or reconcile all parts of a statute: Get Set Organization v. Philadelphia Federation of Teachers, Local No. 3, 446 Pa. 174, 286 A. 2d 633 (1971). Yet we can reconcile §§710 and 505 of the Game Law of 1937 only be giving effect to each. Accordingly, we find, as we must, that a legislative purpose to impose absolute liability under §505 plainly appears;[9] and hence,

---

8. If the statute makes an unintentional killing which is the product of negligence or carelessness fully prosecutable "in the regular manner" and with "full penalty" what would be the need to impose a requirement of criminal intent, in those cases where the killing is in fact intentional?

9. We do not find the provision for a reduced penalty under §710 paradoxical vis a vis a legislative intent to impose absolute liability under §505. Realizing that non-negligent mistake killings would occur irrespective of prohibitions, the legislature reduced penalties therefor as an inducement to violators to field dress the dead animals, thereby preventing some from going to waste. The field dressed animals are forfeited to the Commonwealth, which delivers them to designated charitable institutions (See 34 P.S. §1311.1214 in this regard).

that a culpability requirement is inapplicable thereto.

It is, of course, much too late for petitioner to interpose a §710 defense at this juncture. The record clearly demonstrates that petitioner asked Mr. Johnson "what he should do in the case of shooting a doe." Mr. Johnson replied that "he should contact Mr. Rankin as soon as possible." We know from the testimony of Gary Smith and James Rankin that as of 10:00 P.M. on November 29, 1977, petitioner had not as yet reported killing a doe. Moreover, not until petitioner was cited for the killing approximately 12 hours later, did he admit having killed a doe.

In light of the foregoing testimony, it is clear that petitioner not only failed to comply with the "letter" of §710, but failed to make even a good faith effort to comply with the "spirit" of §710. We have no choice then but to reject any assertion of a §710 defense by petitioner.

As authority for this appeal, petitioner cites four cases in which hunting licenses were restored upon a showing that the violations charged were not the product of intent or wilfullness. Petitioner further contends that those cases are dispositive of the instant case.

Petitioner's reliance on Ligi Appeal, 65 Lack. Jur. 86 (1964); Penna. Game Commission v. Gearhart, 29 North. 136 (1957); Com. v. Learn, 2 D. & C. 397 (1922); and Bruce Appeal, 41 D. & C. 2d 195 (1966) is misplaced. None of these cases involved the same violation for which petitioner here was cited,[10] and could not thus be determinative of the

---

10. Ligi and Gearhart involved violations of 34 P.S. §1311.808; Bruce dealt with violation of 34 P.S. §1311.705; Lean was tried and decided under §19 of the old Game Laws; to wit, the Act of 1917.

issue at bar. Accordingly, the cited cases cannot be dispositive of the instant case.

The Game Commission is authorized by 34 P.S. §1311.315(1) to revoke a hunter's license if the licensee signs an ackowledgment of violating any provision of the Game Act. Petitioner has signed a field acknowledgment of guilt of violating 34 P.S. §1311.505.

We therefore deny and dismiss petitioner's appeal and affirm the Game Commission's suspension of petitioner's hunting license.

## ORDER

And now, January 11, 1979, the appeal of Vincent DeMarteleire is hereby dismissed and the order of the Pennsylvania Game Commission revoking the appellant's hunting privileges for a period beginning September 1, 1978 through August 31, 1980 is hereby affirmed.